N THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JASON DAVID MONACO,

      Plaintiff,

                                   Civil Action 2:22-cv-2888
                                   Judge Sarah D. Morrison
     v.                           Magistrate Judge Elizabeth P. Deavers

JOHN DOE (1), *et al.,*

      Defendants.

## REPORT AND RECOMMENDATION AND ORDER

Plaintiff, Jason David Monaco, currently incarcerated in the Noble Correctional Institution, proceeding *pro se* and *in forma pauperis*, brings this action under 42 U.S.C. § 1983. (ECF No. 29.) Following the Court's previous rulings, Plaintiff is proceeding on his remaining claims as set forth in his Amended Complaint against Defendants Jason Johnson, Michael Mullins, Skyler L. Baldwin, Dawndra Newland, Walter Rumer, Mark Taylor, Justin Cline, Alicia White, Theresa Brown, and Lisa Ragland. This matter is before the Court for consideration of Defendants' Motion for Judgment on the Pleadings; in the Alternative Defendants' Motion for Summary Judgment. (ECF No. 63.) Plaintiff has filed a Response (ECF No. 68) and Defendants have filed a Reply (ECF No. 69). For the reasons that follow, it is **RECOMMENDED** that the Court **GRANT** Defendants' Motion for Summary Judgment.

## I.      BACKGROUND

On September 16, 2022, Plaintiff was granted leave to proceed *in forma pauperis* in this action. (ECF No. 5.) Thereafter, the Undersigned recommended that Plaintiff's claims against all Defendants in their official capacities be dismissed for failure to state a claim and that

Plaintiff's claims of supervisory or vicarious liability claim against John Doe (5); the failure to investigate claim(s) against John Doe (5), Kelly Riehle, the Warden, and the Deputy Warden; the conditions of confinement claim against the Deputy Warden, any remaining claims on behalf of other inmates; any claims based on verbal harassment, loss of personal property, or the Free Exercise Clause also be dismissed. The Undersigned further recommended that Plaintiff be allowed to proceed on certain Eighth Amendment claims against John Does (1), (2), (3), (4), and (6) and Jane Does (1), (2), and (3) in their individual capacities and his first conspiracy claim against John Does (1), (2), (3), and (5) in their individual capacities. (ECF No. 5.) Plaintiff filed no objections and the Court adopted the Report and Recommendation. (ECF No. 8.) Following expedited discovery limited to inquiries regarding the identities of the John and Jane Doe Defendants, Plaintiff filed a Verified Amended Complaint, in part identifying certain John and Jane Doe Defendants. (ECF No. 29.)

Defendants have moved for judgment on the pleadings, or, in the alternative, moved for summary judgment on Plaintiff's claims, accompanying their motion with evidentiary material outside the pleadings. (ECF No. 63.) Rule 12(d) provides that if "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). The Sixth Circuit clarified that under Rule 12(d), if matters outside the complaint are presented with a motion to dismiss, or in this matter, a motion for judgment on the pleading, courts "must *expressly* exclude outside-the-complaint materials or convert the motion to one for summary judgment." *Cotterman v. City of Cincinnati, Ohio*, No. 21-3659, 2023 WL 7132017, *4 (6th Cir. Oct. 30, 2023) (emphasis in original). That is, a "court commits a legal error if it *ignores* the outside materials but treats the motion as a motion to dismiss." *Id.* (emphasis in original).

2

Nevertheless, a court has "discretion either to exclude this outside information (and treat the motion as a motion to dismiss subject to Rule 12's standards) or to consider the information (and treat the motion as a summary-judgment motion subject to Rule 56's standards)." *Id.*  Here, matters outside the Amended Complaint are presented both with Defendants' motion and Plaintiff's response. As the Court will consider these materials in ruling on Plaintiff's claims, the Court, in its discretion, will treat Defendants' motion as one for summary judgment as to these claims.

If matters outside the pleadings are presented to and not excluded by the Court, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).  Here the Court is satisfied that both Plaintiff and Defendants had sufficient notice of the conversion of Defendants' dispositive motion to one for summary judgment. First, Defendants' motion is styled as a motion for judgment on the pleadings, or in the alternative, motion for summary judgment. (ECF No. 63.)   Further, in his 54-page response to Defendants' motion, Plaintiff outlined the Rule 56 standard and presented summary judgment style arguments, with references to the 141 pages of evidentiary documentation he attached. Accordingly, all parties had sufficient notice and a reasonable opportunity to present all pertinent materials to the motion under Rule 12(d).

## II.    FACTS

The events giving rise to Plaintiff's claims occurred while Plaintiff was incarcerated at Ross Correctional Institution ("RCI") for approximately three weeks between January 30, 2021, and February 19, 2021.  The following facts are taken from the various exhibits as submitted by

the parties.[1]

On February 7, 2021, at approximately 9:57 a.m., Defendant Baldwin observed Plaintiff standing by his cell door cutting his wrist with what appeared to be a broken razor blade. (Conduct Report Dated February 7, 2021, ECF No. 63-1, Exhibit 2, PAGEID #: 537; Use of Force Report, ECF No. 63-1, Exhibit 3, PAGEID ##: 538-549; Incident Report, ECF No. 63-1, Exhibit 4, PAGEID #: 550.) ODRC Policy 63-UOF-01(C)[2] authorizes the use of less than deadly force when controlling or subduing an Incarcerated Person in order to stop or prevent self-inflicted harm. (Use of Force Policy Effective November 20, 2020, ECF No. 63-1, Exhibit 6, PAGEID #: 556.) Consistent with ODRC policy, Defendant Baldwin gave several directives to Plaintiff to stop the self-injurious behavior. (Affidavit of Skyler Baldwin, ECF No. 63-1. Exhibit 1a at ⁋ 12 ("Baldwin Aff."); Incident Report, ECF No. 63-1, Exhibit 2, PAGEID #: 537; Baldwin Response to Plaintiff's Second Set of Interrogatories, No. 13, ECF No. 63-1, Exhibit 16, PAGEID #: 626.) Plaintiff did not stop. (Baldwin Aff. at ⁋ 12.) Recognizing that Plaintiff's cutting his wrist quickly could escalate to a life-threatening injury, Baldwin sprayed Plaintiff with one short burst, or eleven grams, of Oleoresin Capsicum ("OC") spray, the minimum force necessary to gain Plaintiff's compliance. (*Id*.; Oleoresin Capsicum Log, ECF No. 63-1, Exhibit 7, PAGEID #: 561.) Plaintiff was placed in handcuffs, handed off to a responding officer, and escorted to medical. (Conduct Report, Exhibit 2, PAGEID #: 537; Baldwin Aff. at ⁋ 13.)

Upon being escorted to medical, Plaintiff was treated by Theresa Brown, RN, at

---

[1] The Court notes that, included in Defendants' exhibits at PAGEID #: 548, is what appears to be a Medical Exam Report for Defendant Baldwin, filed in redacted form without leave to do so having been granted by the Court. This form was not necessary for the Court's disposition of Plaintiff's claims. The Court accordingly **STRIKES** the Report from the record.

[2] Defendants appear to cite the relevant provision incorrectly as 63-UOD-01(D)(6). *See* ECF No. 63 at n.3.

approximately 10:13 A.M. Plaintiff reported "I was cutting myself because I am depressed."
(Nurse Sick Call, 2-7-2021, ECF No. 63-1, Exhibit 8, PAGEID #: 562.) Plaintiff's hand-written
Inmate Use of Force Statement also states "I cut myself because I was feeling suicidal. The block
warned me I needed to leave." (Inmate Use of Force Statement, ECF No. 63-1, Exhibit 3,
PAGEID #: 547.) As a result of his actions, Plaintiff was placed on continuous suicide watch.
(Nurse Sick Call, 2-7-2021, ECF No. 63-1, Exhibit 3; PAGEID #: 562.) Although Nurse Brown
documented eye and skin irritation from exposure to OC spray, Plaintiff refused treatment. (*Id.*
at PAGEID #: 563; Declaration of Theresa Brown, ECF No. 63-1, Exhibit 1b at ⁋ 7; PAGEID #:
517 "Brown Decl.")

     Plaintiff's medical records demonstrate that, during his evaluation, his blood pressure
was 145/95. (Nurse Sick Call, 2-7-2021, ECF No. 63-1, Exhibit 8, PAGEID #: 562.) Further, his
pulse rate was 92, his pulse ox was 98%, his respiration was unlabored, easy, and even, his
cardiovascular rhythm was regular and his lungs sounded normal. (*Id*.). There were no medical
reasons to provide additional care related to Plaintiff's blood pressure or his exposure to OC
spray. (Brown Decl.; Affidavit of Lisa Ragland, ECF No. 63-1, Exhibit 1c, PAGEID #: 518-519
"Ragland Aff.")

     After Plaintiff's medical treatment was completed, Captain Michael Farley placed
Plaintiff on Constant Watch. (Authorization for Crisis Precaution, ECF No. 63-1, Exhibit 8;
PAGEID #: 566.) For safety reasons, incarcerated persons placed on Constant Watch for
suicidal behavior are only provided with a Ferguson Gown and a safety blanket. (Affidavit of
Michael Farley, ECF No. 63-1, Exhibit 1c at ⁋ 10, PAGEID #: 520.) Further, they are placed in
cells that do not have mattresses and are not allowed to shower until cleared to do so by a mental

health provider.  (*Id.* at ⁋ 11.) These protocols were followed when Plaintiff was placed on Constant Watch.  (ECF No. 29, ¶ 23, PAGEID #: 266.)

Defendant White was one of Plaintiff's assigned Constant Watch Officers. (Crisis Precaution Log, ECF No. 63-1, Exhibit 10; PAGEID ##: 578-579.)  Constant Watch COs monitor inmates who have been placed on suicide watch.  (Farley Aff. at ⁋ 12.)  They are required to constantly observe the inmate and document their observations at staggered intervals not to exceed 15 minutes. (*Id.*)  Officer White documented that Plaintiff spent most of his time quiet and seclusive (Constant Watch Log, 02/07/2021, ECF No. 63-1, Exhibit 10; PAGEID ##: 578-579.)  Her shift entries largely reflect that Plaintiff was laying on his bed.  (*Id.*).  An entry at 4:00 P.M. reflects that Plaintiff reported that when he cried, his eyes burned.  (*Id.)*  Plaintiff was seen by medical at 5:03 P.M.  (*Id.*)

On February 8, 2021, Justin Cline, a Licensed Professional Clinical Counselor, saw Plaintiff for a mental health assessment related to the February 7, 2021, self- harming incident. (Affidavit of Justin Cline, ECF No. 63-1, Exhibit 1e, ⁋ 5; PAGEID #: 522 "Cline Aff.")  During that assessment, Plaintiff reported that on February 7, 2021, he was unable to check in, was feeling hopeless, and that he was feeling scared as a result of a security threat group bothering him about the type of charges he had. (MH Initial Crisis Assessment (02/08/2021), ECF No. 63-1, Exhibit 11; PAGEID #: 585). Plaintiff was downgraded from constant watch to MHSOS (Mental Health Special Observation Status) with a mental health follow up ordered for February 9, 2021. (*Id*. at PAGEID #: 586). Mr. Cline also authorized Plaintiff to take showers. (Crisis Precaution Disposition and Property, ECF No. 63-1, Exhibit 11; PAGEID #: 589.)  Mr. Cline, as a mental health provider, would not have taken Plaintiff to the showers himself.  (Cline Aff. at ⁋

6

6; Farley Aff. at ❡ 13.)   Rather, once it was authorized, the corrections officers would arrange

the same.  (*Id.*)

Plaintiff was served with a Conduct Report for his self-harming behavior. (Conduct

Report, ECF No. 63-1, Exhibit 2; PAGEID #: 537.)  He was charged with Rules Violations 21

and 57 (Disobedience of a direct order, Self mutilation, including tattooing).  (*Id.*).  Sgt. Taylor

was the hearing officer.  (Affidavit of Mark Taylor, ECF No. 63-1, Exhibit 1k, ❡ 3; PAGEID #:

534.)   A plea of not guilty was entered on behalf of Plaintiff. (Hearing Officer's Report, ECF

No. 63-1, Exhibit 12; PAGED #: 590.)  The matter was set over to February 18, 2021. (*Id.*)

Plaintiff refused to attend the subsequent RIB hearing.  (*Id.* at PAGEID #: 594.)  He was found

guilty of the violations and given seven (7) days in Restrictive Housing.  (*Id.* at 595.)

Plaintiff filed his first grievance regarding this matter on June 15, 2021. (ECF No. 29, ¶

30, PAGEID #: 267; NCI0621002365, ECF No. 63-1, Exhibit 13, PAGEID #: 598.)  Although

filed past the 14 days, the grievance was considered to be a timely and allowed to proceed.  (*Id.*)

Plaintiff asserted the following in his grievance:

> I hope this is the inspector Starr. I have a pretty lengthy story about incidents that
> happened at Ross while I was there in February. I waited until now because I wasnt
> [sic] sure if I could trust rocking the boat while in it. I reported being threatened by
> a group of individuals to the CO's on three different shifts. I finally decided I needed
> to take it up a level and start cutting myself to get their attention, to make them do
> their job. I did, I listened, He sprayed me anyway. There is more to this story.......
> Jason

(*Id.*)  The grievance was denied and Plaintiff filed an appeal, adding additional details about

"[a]n officer threatening to plant 'tune' (drugs)" if he tried to check in, that he reported to a

"Seargent in Segregation" that he did not feel safe, and that he did not trust the staff in mental

health.  (*Id.*).  Plaintiff did not grieve poor medical treatment by nursing staff, not being able

decontaminate in a timely manner, or not receiving appropriate mental health treatment from

7

mental health. (*Id.*). Plaintiff's appeal was denied. (*Id.* at PAGEID #: 599; Doc. 29, ¶ 32, PAGEID #: 268; NCI0621002365).

On May 13, 2022, Plaintiff filed a subsequent informal complaint. (Doc. 29, ¶ 30, PageID 267; NCI0522001632, ECF No. 63-1, Exhibit 13; PAGEID #: 601). At this time, Plaintiff alleged that on February 7, 2021, he "neglected to speak of the fact that I was placed in the suicide cell without a running shower or sink to wash off the oc spray for 2 days." (*Id.*) Plaintiff blames "medical" the "female CO on 24-hour watch" and the "doctor evaluating me the second day." (NCI0522001632). On May 17, 2022, Plaintiff escalated the denial and added additional complaints about his elevated blood pressure. (*Id.*) This complaint was denied for being untimely. (*Id.* at PAGEID #: 602.)

For his part, Plaintiff offers additional information, largely by way of the allegations in his Verified Amended Complaint. To be sure, a verified complaint has the same force and effect as an affidavit for summary judgment purposes. *Talismanic Properties, LLC v. Tipp City, Ohio*, 309 F. Supp. 3d 501 (S.D. Ohio 2017), *aff'd sub nom. Talismanic Properties, LLC v. City of Tipp City, Ohio*, 742 F. App'x 129 (6th Cir. 2018). Nevertheless, "conclusory assertions, unsupported by *specific facts* made in affidavits opposing a motion for summary judgment, are not sufficient to defeat a motion for summary judgment." *Brady v. DaVita, Inc.*, No. 1:20-CV-00910, 2022 WL 2046212, at *8 (S.D. Ohio June 7, 2022), *report and recommendation adopted,* No. 1:20-CV-00910, 2022 WL 4480126 (S.D. Ohio Sept. 27, 2022), *appeal dismissed*, No. 22-3905, 2023 WL 3090626 (6th Cir. Feb. 6, 2023).

As will become evident from the following discussion, Plaintiff's information is aptly described as his interpretation of certain events and is comprised largely of self-serving or conclusory statements unaccompanied by specific factual detail. As such, it is insufficient to

create an issue of fact to survive summary judgment under the standard set forth below. Indeed, if, as is the case here, a plaintiff merely setting forth such allegations in "verified" form were sufficient, "then any plaintiff could use a self-serving affidavit to defeat a motion for summary judgment." *Blankenship v. State Farm Fire & Cas. Co.,* No. CV 21-7-DLB-EBA, 2023 WL 2637358, at *7 (E.D. Ky. Mar. 24, 2023). For this reason, Plaintiff's allegations will be set forth only to the extent necessary to the discussion which follows.

### III. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The burden of proving that no genuine issue of material fact exists falls on the moving party, "and the court must draw all reasonable inferences in the light most favorable to the nonmoving party." *Stransberry v. Air Wisconsin Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (citing *Vaughn v. Lawrenceburg Power Sys.*, 269 F.3d 703, 710 (6th Cir. 2001)); *cf.* Fed. R. Civ. P. 56(e)(2) (providing that if a party "fails to properly address another party's assertion of fact" then the Court may "consider the fact undisputed for purposes of the motion").

"Once the moving party meets its initial burden, the nonmovant must 'designate specific facts showing that there is a genuine issue for trial.'" *Kimble v. Wasylyshyn*, 439 F. App'x 492, 495 (6th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317-324 (1986)); *see also* Fed. R. Civ. P. 56(c) (requiring a party maintaining that a fact is genuinely disputed to "cit[e] to particular parts of materials in the record"). "The nonmovant must, however 'do more than simply show that there is some metaphysical doubt as to the material facts,' ... there must be evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to

create a 'genuine' dispute." *Lee v. Metro. Gov't of Nashville & Davidson Cty.*, 432 F. App'x 435, 441 (6th Cir. 2011) (citations omitted).

In considering the factual allegations and evidence presented in a motion for summary judgment, the Court "must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995). "When a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case, summary judgment is appropriate." *Stransberry*, 651 F.3d at 486 (citing *Celotex*, 477 U.S. at 322–23).

## IV. ANALYSIS

As explained above, Plaintiff is proceeding on certain Eighth Amendment claims against John Does (1), (2), (3), (4), and (6) and Jane Does (1), (2), and (3) in their individual capacities. These claims include a failure to protect claim, an excessive force claim, and a deliberate indifference to serious medical needs claim. More specifically, now that Plaintiff has identified the John and Jane Doe Defendants, his failure to protect claim is proceeding against Officers Jason Johnson, Michael Mullins, and Skyler L. Baldwin; his excessive force claim is proceeding against Skyler L. Baldwin, and his medical claim is proceeding against Dawndra Newland, Walter Rumer, Justin Cline, Alicia White, Theresa Brown, and Lisa Ragland. Further, Plaintiff's conspiracy claim is proceeding against Jason Johnson, Michael Mullins, Skyler L. Baldwin, and Mark Taylor. The Undersigned addresses these claims as follows.

### A. Deliberate Indifference to Serious Medical Needs and Conspiracy Claims

Initially, Defendants contend that these claims must be dismissed for Plaintiff's failure to exhaust his administrative remedies as required by 42 U.S.C. § 1997e(a) of the Prison Litigation

Reform Act (PLRA). Additionally, Defendants argue that, even assuming Plaintiff's proper exhaustion, these claims fail on their merits. The Undersigned agrees on both counts. Accordingly, it is **RECOMMENDED** that summary judgment be granted in Defendants' favor on these claims.

### 1. Exhaustion

Turning first to the matter of exhaustion, pursuant to the PLRA, prisoners are required to fully exhaust available institutional remedies prior to filing suit in federal court. *See* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). The Supreme Court has held that the "PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532, 122 S. Ct. 983 (2002).

It is well established that such exhaustion is "mandatory under the PLRA and unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 201, 211 (2007). The PLRA requires "proper exhaustion of administrative remedies," meaning all applicable procedures and deadlines must be followed. *Woodford v. Ngo*, 548 U.S. 81, 84, 90-91 (2002). The exhaustion requirement's goals can be achieved "only if the prison grievance system is given a fair opportunity to consider the grievance." *Id.* at 82. "That cannot happen unless the grievant complies with the system's critical procedural rules." *Id.* If a prisoner fails to exhaust available administrative remedies before filing a complaint in federal court, or only partially exhausts them, then dismissal of the complaint is appropriate. *Hopkins v. Ohio Dep't of Corr.*, 84 Fed.

Appx. 526, 527 (6th Cir. 2003) (citing 42 U.S.C. § 1997e(a) and *White v. McGinnis*, 131 F.3d

593, 595 (6th Cir. 1997)).  "In a claim by a prisoner, failure to exhaust administrative remedies

under the PLRA is an affirmative defense that must be established by the defendants."  *Napier v.*

*Laurel Cnty.*, 636 F.3d 218, 225 (6th Cir. 2011) (citing *Jones,* 549 U.S. at 204).

The Ohio Department of Rehabilitation and Correction ("ODRC") offers a three-step

grievance system to every inmate at each of its institutions. Ohio Admin. Code § 5120-9-31(J).

All inmates and staff members receive a written explanation of the grievance system and

instructions for its use. Ohio Admin. Code § 5120-9-31(C).  The first step of the grievance

procedure allows inmates to submit an informal complaint to the supervisor of the department or

staff member directly responsible for the issue concerning the inmate but requires any such

complaint or grievance to be submitted no later than fourteen days from the date of the event

giving rise to the grievance.  Ohio Admin. Code § 5120-9-31(J)(1).  Inmates dissatisfied with the

results of step one may proceed to step two by obtaining a Notification of Grievance form from

the Inspector of Institutional Services and filing a formal grievance at the prison where the

inmate is confined. Ohio Admin. Code § 5120-9-31(J)(2).  Formal grievances must be submitted

within fourteen days from the date an inmate receives a response to his informal complaint at

step one. *Id.*

If dissatisfied with the results of his formal complaint at step two, the inmate may

proceed to step three of the grievance process by requesting an appeal form from the Office of

Inspector of Institutional Services and submitting the appeal form to the Office of the Chief

Inspector at ODRC. Ohio Admin. Code § 5120-9-31(J)(3).  The step three appeal must be filed

within fourteen days of the date of the disposition of his formal complaint.  The Chief Inspector

is to provide a written response within thirty calendar days of receiving an appeal, unless he

extends the timeframe for good cause and notifies the inmate. *Id.* Decisions of the Chief Inspector are final, meaning that the Ohio Administrative Code provides no further means for appeal. *Id.*

Because exhaustion is an affirmative defense that must be raised by a defendant, a plaintiff is not required to *plead* exhaustion in his complaint. And – but for the rare case in which a plaintiff has included allegations or evidentiary exhibits that convincingly show he has failed to exhaust - a defendant cannot win on this defense unless *the defendant proves* a lack of exhaustion. Therefore, multiple courts have acknowledged that "the exhaustion affirmative defense is best raised in a motion for summary judgment ... because proof of lack of exhaustion generally requires resort to matters outside the pleadings, such as affidavits and documentary evidence." *Hollis v. Erdos*, 480 F. Supp.3d 823, 830-31 (S.D. Ohio 2020) (citing *Daugherty v. K.S.P. Medical Department*, 2018 WL 1095820, at *3 (W.D. Ky. Feb. 27, 2018)). "When the defendants in prisoner civil rights litigation move for summary judgment on administrative exhaustion grounds, they must prove that no reasonable jury could find that the plaintiff exhausted his administrative remedies." *Mattox v. Edelman*, 851 F.3d 583, 590 (6th Cir. 2017) (citing *Surles v. Andison*, 678 F.3d 452, 455-456 (6th Cir. 2012)).

Plaintiff filed his first grievance regarding this matter on June 15, 2021. (ECF No. 29, at ¶ 30, PageID #: 267; NCI0621002365, ECF No. 63-1, Exhibit 13; PAGEID #: 598.) This grievance, although filed after the 14-day deadline, was considered to be timely and allowed to proceed. (*Id.*) Plaintiff's grievance states:

> I hope this is the inspector Starr. I have a pretty lengthy story about incidents that happened at Ross while I was there in February. I waited until now because I wasnt [sic] sure if I could trust rocking the boat while in it. I reported being threatened by a group of individuals to the CO's on three different shifts. I finally decided I needed to take it up a level and start cutting myself to get their attention, to make them do their job. I did, I listened, He sprayed me anyway. There is more to this story.......

13

Jason

(NCI0621002365.) After that grievance was denied, Plaintiff filed an appeal, adding additional

details about "[a]n officer threatening to plant "tune" (drugs)" if he tried to check in, that he

reported to a sargent in Segregation that he did not feel safe, and that he did not trust the staff in

mental health. (*Id.*). Plaintiff, however, did not grieve poor medical treatment by nursing staff,

not being able decontaminate in a timely manner, or not receiving appropriate mental health

treatment from mental health. (*Id.*). Plaintiff's appeal was denied. (ECF No. 29, at ¶ 32,

PAGEID #: 268; NCI0621002365.)

On May 13, 2022, nearly fifteen months after the alleged incident, Plaintiff filed a second

informal complaint relating to events while he was housed at Ross. (ECF No. 29, at ¶ 30,

PageID #: 267; NCI0522001632, ECF No. 63-1, Exhibit 13; PAGEID #: 601.) That complaint

stated:

> In NCI0621002365 (need to doublecheck) last year concerning an incident at Ross
> on 2-07-21, a key detail was neglected in the investigation. I was focused on being
> sprayed more than anything and it being unjustified. I neglected to speak of the
> fact that I was placed in the suicide cell without a running shower or sink to wash
> off the oc spray for 2 days. Yes they took me to medical, I asked to wash and they
> laughed. I was in serious distress for 2 days. This was an 8th amendment, cruel and
> unusual punishment situation. I asked the female CO on 24hr watch to let me wash
> up the first night, the other officer (yard dog who walked me) was passing thru and
> said "burn baby burn". I asked the doctor evaluating me the second day if I could
> wash and he said "I dont think so". I wrote the chief inspector about the same time
> as [the] first grievance and this was in that letter. However, it needs to go thru these
> channels too.

(*Id.*)

On May 17, 2022, Plaintiff received the following response, closing his complaint form:

> Monaco,
> On 2/7/21 @9:57 AM in &A cell 258 you were observed by an officer where you
> were attempting self-injury behavior by cutting your left wrist with a razor blade.
> The officer requested that you cease this behavior which based on the incident

> summary states that you continued the behavior and therefore O.C. was utilized to achieve compliance. This UOF procedure is consistent with 63-UOF-01 in achieving compliance to cease self-injury.
> You were observed by medical on 2/7/21 @ 10:13 AM where the nurses diagnosis was that you had superficial injury to your left wrist, right eye and skin irritation from exposure to OC spray. All other medical symptoms were normal. Medical report states that you refused treatment.
> Based on your behavior you were placed in a suicide watch cell and a Mental Health referral was made immediately.

(*Id.*) Upon receipt, Plaintiff escalated the denial by disputing its bases and raising additional claims relating to the incident, including about his elevated blood pressure. Plaintiff's complaint ultimately was denied as untimely. (*Id.* at PAGEID #: 602.)

These documents demonstrate that Plaintiff did not timely grieve a claim relating to deliberate indifference to his medical needs. Further, they also show that Plaintiff did not assert any allegations against Defendants Johnson, Mullin, Baldwin or Taylor relating to a conspiracy against inmates with sex cases. Nothing in Plaintiff's Verified Amended Complaint challenges this timeline or the nature of the issues raised through the grievance process. In his response, Plaintiff attempts to explain away his failure to raise such allegations by stating that he "could not possibly address all of the details of this case in the initial grievance." (ECF No. 68-1 at 2.) He specifically faults the mechanics of the grievance system, complaining that it is difficult to raise multiple issues within the same grievance. (*Id.*) He then attempts to shift the blame to "the State," arguing that it did not take advantage of the "ample opportunities" he provided "to properly address all claims in this case." (*Id.*) What Plaintiff fails to do, however, is raise any genuine issue of material fact regarding the exhaustion of these specific claims. In the absence of any genuine issue of material fact, Defendants have met their burden of demonstrating that Plaintiff failed to exhaust his remedies as to his medical deliberate indifference and conspiracy claims.

## 2. Merits

Moreover, even if Plaintiff could be found to have exhausted his administrative remedies, both claims also fail on their merits.

### a. *Medical Deliberate Indifference Claim*

Turning first to Plaintiff's medical deliberate indifference claim, Plaintiff asserts this claim against Defendants Newland, Rumer, Cline, White, Brown and Ragland.  It is well established that "[t]he Eighth Amendment forbids prison officials from unnecessarily and wantonly inflicting pain on an inmate by acting with deliberate indifference toward [his] serious medical needs." *Jones v. Muskegon Cty.*, 625 F.3d 935, 941 (6th Cir. 2010) (internal quotations omitted).  A claim for deliberate indifference "has both objective and subjective components." *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011). The United States Court of Appeals for the Sixth Circuit has explained:

> The objective component mandates a sufficiently serious medical need. [*Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 895 (6th Cir. 2004).] The subjective component regards prison officials' state of mind. *Id.* Deliberate indifference "entails something more than mere negligence, but can be satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 895–96 (internal quotation marks and citations omitted). The prison official must "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 896 (internal quotation marks and citation omitted).

*Barnett*, 414 F. App'x at 787–88.  "In examining whether a claimed injury is 'sufficiently serious'" to sustain a claim for deliberate indifference, "courts look to the *effect* of any delay in treatment caused by an officer's inaction."  *Vaughn v. City of Lebanon*, 18 F. App'x 252, 274 (6th Cir. 2001) (emphasis in original).

The Sixth Circuit also has noted that in the context of deliberate indifference claims:

> "[W]e distinguish between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate

16

> medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976).
> Where a prisoner alleges only that the medical care he received was inadequate,
> "federal courts are generally reluctant to second guess medical judgments." *Id.*
> However, it is possible for medical treatment to be "so woefully inadequate as to
> amount to no treatment at all." *Id.*

*Alspaugh*, 643 F.3d at 169. Moreover, "when a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation." *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013).

Plaintiff makes identical allegations against Defendants Newland, Rumer, White, Cline, Brown and Ragland asserting that they did not allow him to wash the OC spray from his eyes or body and this caused him to nearly go into cardiac arrest over the course of 48 hours. (ECF No. 29 at ¶¶ 42, 42.5, 46, 48, 50, 52.) Plaintiff, however, has not shown that any medical diagnosis made him particularly vulnerable to chemical agent exposure, nor has he established a serious medical need beyond the normal effects associated with pepper spray exposure. *See*, *e.g.*, *McGuire v. Union Cty. Jail*, No. 4:13-cv-P28, 2013 WL 4520282, at *5-6 (W.D. Ky. Aug. 26, 2013) (plaintiff failed to show how complaints of eye burning and runny nose after being pepper sprayed rose to the level of a "sufficiently serious" medical need); *Censke v. Unknown Ekdahl*, No. 2:08-cv-283, 2009 WL 1393320, at *8 (W.D. Mich. May 18, 2009) (plaintiff's complaints of "burning in his nose, lungs, eyes and skin ... do not constitute a serious medical need for purposes of the Eighth Amendment"); *Reeves v. Sweet*, No. 1:04-cv-605, 2005 WL 2417659, at *4 (W.D. Mich. Sept. 30, 2005) ("although [p]laintiff complains that he had breathing difficulties [after exposure to pepper spray], he has failed to present facts demonstrating that those difficulties were sufficiently different in degree or type from those experienced by others exposed to the spray, and he has asserted no adverse medical consequences from the exposure.").

Moreover, the evidence submitted by Defendants establishes that Plaintiff received

medical care after the pepper spray incident. According to Defendant Brown:

> On February 7, 2021, at approximately 10: 13 a.m., I started my treatment of Jason
> Monaco pursuant to a use of force incident related to his self-harming. l conducted
> a visual inspection of Mr. Monaco. I found him to be alert and oriented with teary
> eyes and minor skin irritation from exposure to OC spray. I determined that his only
> injury was a 2.5 cm superficial abrasion to his wrist and old scabbing to bilateral
> shins. I noted that his breathing was not compromised. I took his vitals, which
> confirmed that his temperature, pulse, oxygen levels, and respiration were all within
> normal range. Although his blood pressure was elevated, it was not dangerously
> high and .it did not require additional medical attention. Nothing about his
> presentation required transportation to an outside location for treatment.
>
> During his assessment, Jason Monaco was offered an opportunity [to]
> decontaminate. He refused the same.
>
> When I provided medical treatment to Jason Monaco, I had no reason to suspect,
> nor was it medically indicated that he faced a substantial risk of serious harm by
> not being able to decontaminate from O/C spray.
>
> When I provided medical treatment to Jason Monaco, I had no reason to suspect,
> nor was it medically indicated that he faced a substantial risk of serious harm from
> his elevated blood pressure.

(Brown Decl., ECF No. 63-1, Exhibit 1b at ⁋⁋ 6-; PAGEID #: 516-517.) Defendant

Ragland, characterized by Plaintiff as "more [of] an observer," confirms Defendant

Brown's version of events. (Ragland Aff., ECF No. 63-1, Exhibit 1c at ⁋⁋ 6-7; PAGEID

#: 518-519.)

Further, the sick call records dated February 7, 2021 (ECF No. 63-1, Exhibit 8 at 50-53;

PAGEID #: 562-565) state that the subjective reason for Plaintiff's medical examination was the

use of force and Plaintiff's explanation that he "he was cutting himself because [he was]

depressed." (*Id*.) His sitting blood pressure was recorded as 145/95, his pulse rhythm was

regular and his respiration was unlabored. (*Id*.) The objective physical findings included that

Plaintiff was "[a]lert and oriented with teary eyes; resp. even and easy, gait steady, speech clear,

Patient has a 2.5 cm superficial abrasion to the left wrist, and old scabbing to bilateral shins. (*Id.*) Patient reports he is feeling self injurious and depressed." (*Id.*) Bacitriacin and a bandaid were applied to Plaintiff's wrist and he was placed on constant watch for his safety and released to restrictive housing. (*Id.*) Plaintiff reported that his eyes were tearing and the nursing diagnosis stated that "[a]lteration in comfort R/T eye and skin irritation from exposure to OC spray" but Plaintiff "refused treatment." (*Id.*)

In his Affidavit, Defendant Cline, a Licensed Professional Clinical Counselor, states that he was not working on February 7, 2021 but that he saw Plaintiff on February 8, 2021, for an initial crisis assessment following Plaintiff's self-harming behavior and report that he was suicidal. (Cline Aff., ECF No. 63-1, Exhibit 1e, at ₽ 5; PAGEID ##: 522-523.) Defendant Cline removed Plaintiff from Constant Watch and placed him on Mental Health Special Observation in a Safe Cell with physical checks and documentation at staggered intervals not to exceed every 30 minutes. (*Id.*) Defendant Cline authorized Plaintiff to take showers at least five times per week but Defendant Cline was not authorized to administer those showers. (*Id.* at ₽₽ 5-6.) At the time of his assessment, Defendant Cline did not observe Plaintiff to be in medical distress but did observe him to be in mental health distress. (*Id.* at ₽ 7.)

Further, Plaintiff has provided no evidence indicating that Defendants Newland, Rumer or White, all corrections officers, had any basis for believing that he required medical attention. Indeed, Plaintiff concedes that summary judgment should be granted in Defendant Rumer's favor because "the evidence does not support Walter Rumer as being the 'Escort'" alleged in the Amended Complaint. (ECF No. 68-1 at 6.) Further, Plaintiff also concedes that Defendant Newland was not the "Escort" as described in Paragraph 21 of the Amended Complaint but that this "does not absolve [her] from her involvement in the suicide watch." (*Id.*) Plaintiff is

mistaken to the extent that he believes any claim against Defendant Newland survives this concession. **Importantly, Defendant Newland is a woman.** (Farley Aff., ECF No. 63-1, Exhibit 1d, at ¶ 14; PAGEID #: 521.) To the extent Plaintiff pins his medical deliberate indifference claim to actions taken by Defendant Newland in her role as the "Constant Watch Officer," the allegations of his Verified Amended Complaint again fail to distinguish between the actions of Defendant Newland and Defendant Rumer, and refer consistently to a male "yard dog" CO. (ECF No. 29 at ¶¶ 22-24.) Finally, Plaintiff's sole factual allegation directed to Defendant White is that he "cried in agony to Officer Alicia White who was on 24-hour watch." (*Id*. at ¶ 24.) This conclusory statement, without additional factual detail, is insufficient to allow Plaintiff to prevail on a medical deliberate indifference claim against Defendant White. Moreover, the Crisis Log submitted by Defendants confirms that Defendant White was assigned to constant watch duty on February 7, 2021, from 1:57 P.M. until 9:43 P.M. (Crisis Log, ECF No. 63-1, Exhibit 10; PAGEID #: 578-579.) The Crisis Log reflects an entry by Defendant White at 4:00 P.M. noting that Plaintiff "said when he cries, his eyes burn." (*Id.*) The Crisis Log further confirms that Plaintiff spoke to a nurse approximately 1 hour later at 5:03 P.M., undermining any claim of Defendant White's deliberate indifference.[3]

---

[3] In her Affidavit, Defendant White states that Plaintiff was seen by medical a second time at 7:37 P.M. after having been seen by medical prior to being placed in constant watch. (Affidavit of Alicia White Brogdon, ECF No. 63-1, Exhibit 1i, at ¶ 11, PAGEID #: 531.) As noted, a Crisis Log entry indicates that Plaintiff was seen by a nurse at 5:03 P.M. This entry, however, is aligned by column with the later entry on the Log at 7:37 PM indicating that Plaintiff was sleeping. This column alignment appears to explain the discrepancy in the time. The point, however, is that Plaintiff was seen by medical a second time on February 7, 2021, while under Defendant White's watch. And, importantly, this second encounter with medical occurred after Plaintiff reported to Defendant White that "when he cries his eyes burn" a complaint which, according to the Crisis Log, Plaintiff made at 4:00 P.M.

Moreover, Plaintiff's allegation of a potential heart attack arising from the circumstances of the OC spray, which lies at the heart of his medical deliberate indifference claim against these Defendants, is purely speculative. Such speculation simply "does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *McDougald v. Bear*, No. 1:17-CV-124, 2019 WL 652501, at *8 (S.D. Ohio Feb. 15, 2019), *report and recommendation adopted*, No. 1:17-CV-00124, 2019 WL 4126394 (S.D. Ohio Aug. 30, 2019). The same can be said of Plaintiff's claim that his blood pressure was high and required immediate attention. Plaintiff has failed to produce any medical evidence demonstrating that these alleged circumstances required medical treatment beyond that provided. For all of these reasons, Plaintiff has failed to raise any genuine issue of material fact regarding his claim of deliberate indifference to his serious medical needs.

### b. *Conspiracy Claim*

As for Plaintiff's conspiracy claim, "[a] civil conspiracy under § 1983 is 'an agreement between two or more persons to injure another by unlawful action.'" *Scott v. Whittaker*, No. 1:23-CV-P172-JHM, 2024 WL 1837978, at *2 (W.D. Ky. Apr. 26, 2024) (citing *Hensley v. Gassman*, 693 F.3d 681, 695 (6th Cir. 2012) (quoting *Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985)). To succeed on his conspiracy claim, Plaintiff must show the existence of a single plan, that the alleged co-conspirators shared in the general conspiratorial objective to deprive him of a federal right, and that an overt action committed in furtherance of the conspiracy caused him injury. *Id.*; *see also Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011). And, Plaintiff must do so with particularity. *Id.* Plaintiff absolutely fails to make any showing regarding these elements here, let alone any showing with particularity. At best, Plaintiff alleges that Defendants Johnson, Mullins, Baldwin and Taylor were aware that inmates convicted of

21

sexual charges were targeted.  This is nothing more than a bare allegation of conspiracy unaccompanied by any specific facts to indicate a conspiracy existed.

### B.  Collective Reference to Defendants Johnson and Mullins[4]

In his initial Complaint, Plaintiff names several John and Joe Defendants.  In his Amended Complaint, Plaintiff does not establish which named Defendants have been substituted for John Does 1, 2, or 4.  For example, with respect to the substitution of John Does 1 and 2, Plaintiff sets forth the following factual allegations:

> The CO, **either officer Jason Johnson or Michael Mullins**, a man about 6' tall and 170 lbs. with a mullet (on duty in Unit 7a, February 6th, 2021, at about 6:30 PM), yelled at me to lock down or "I will come up there and spray both of your asses and plant tune in your cell, and I've got a lot of it!" Then, his companion CO **either Jason Johnson or Michael Mullins** (a bald man of approximately 6' and 230 lbs. on duty, February 6 ,2021, -6:30 PM, Dorm 7A) came up about 15 minutes later and showed an approximately 1 cmx 1 cm square piece of yellowed paper in the window just to prove it.

(ECF No. 29, ⁋ 19.)  Plaintiff further asserts that Officer Jason Johnson

---

[4] Similarly, in the Amended Complaint, Plaintiff identifies John Doe 4 as " the yard dog" CO, **either D. Newland or W. Rumer** (a man, late 20's, 6' tall, medium build) escorted me and had to stop and tell every CO along the way about how he had another "chomo" as they all laughed." (ECF No. 29 at ⁋ 21.)  Plaintiff later asserts the following allegations against Defendant Newland

> through his gross negligence of duty in his individual capacity, deliberately operated to intentionally inflict emotional distress and severe pain upon Mr. Monaco. Officer D. Newland directly, and with malicious intent, violated Mr. Monaco's 8th Amendment Right to be free from cruel and unusual punishment by denying medical care with deliberate indifference by not allowing Mr. Monaco to wash himself of the OC Spray in his eyes and on his person, nearly causing Mr. Monaco to go into cardiac arrest on more than one occasion over the course of 48 hours. Officer D. Newland directly violated Mr. Monaco's Constitutional Rights.

(ECF No. 29 at ¶ 42.)  Plaintiff makes the identical allegations against Defendant Rumer.  (ECF No. 29 at ¶ 42.5.)  As discussed above, however, Plaintiff has conceded summary judgment should be granted in Defendant Rumer's favor.  Also, any medical deliberate indifference claim against Defendant Newland either remains attributed to Defendant Rumer, is barred by Plaintiff's failure to exhaust, or fails on its merits.

> through his gross negligence of duty in his individual capacity, violated Mr. Monaco's 8th Amendment Rights by deliberately failing to provide a degree of caution and foresight an ordinarily prudent person would employ in similar circumstances, including the duty to exercise reasonable care to prevent an inmate from being injured by a dangerous condition about which the state knows or should know. The officer operated to intentionally inflict emotional distress and physical pain upon Mr. Monaco by not removing him from the dorm for protective custody in violation of his constitutional rights.

(ECF No. 29 at ¶ 35) and

> committed conspiracy in his individual capacity. The officer acted in concert, through his gross negligence of duty in his individual and official capacity, with the other defendants in a conspiracy against those with sex cases. The officer was aware of the targeting of individuals in the dorm and the act was premeditated.

(ECF No. 29 at ¶ 36.)  Plaintiff makes the same allegations verbatim against Defendant Mullins.  (ECF No. 29 at ¶¶ 37, 38.)  Further, Plaintiff fails to identify whether Defendant Johnson or Defendant Mullins threated to plant the "tune," whether it was Defendant Johnson or Defendant Mullins who showed up and indicated an ability to plant the "tune," or whether either of these Defendants failed to permit Plaintiff to "check in."

Plaintiff fails to attribute any specific actions to these specific Defendants.  This evident shortcoming is problematic for Plaintiff because "[t]he law is well settled that '[p]ersons sued in their individual capacities under § 1983 can be held liable based only on their own unconstitutional behavior.'"  *Tietz,* No. 20-10814, 2021 WL 253885, at *10 (E.D. Mich. Jan. 26, 2021) (citing *Heyerman v. Cnty. of Calhoun*, 680 F.3d 642, 647 (6th Cir. 2012)).  "Indeed, the Sixth Circuit 'has consistently held that damage claims against government officials arising from alleged violations of constitutional rights must allege, with particularity, facts that demonstrate what each defendant did to violate the asserted constitutional right[, and the court] must analyze separately whether [the plaintiff] has stated a plausible constitutional violation by each individual defendant, and [ ] cannot ascribe the acts of all individual Defendants to each individual defendant.'"  *Id.* (quoting *Heyne v. Metropolitan Nashville Pub. Sch.*, 655 F.3d 556, 564 (6th Cir.

2011)).  Plaintiff attempts to explain this collective reference by suggesting that what he clearly meant was that both Defendants are responsible for the alleged violations.  The language of Plaintiff's pleading suggests otherwise, however, and Plaintiff's after the fact explanation has no bearing.  Accordingly, in the absence of specific conduct assigned to these specific Defendants, Plaintiff cannot succeed on his claims against Defendants Johnson and Mullins.

### C. Failure to Protect Claim

Plaintiff alleges an identical failure to protect claim purportedly against Defendants Jason Johnson, Michael Mullins, and Skyler Baldwin.  As discussed above, in alleging such a claim, Plaintiff fails to allege the specific conduct engaged in by Defendants Johnson or Mullins and this is a sufficient basis for granting summary judgment as to these Defendants.  Beyond this, "[t]o state a failure-to-protect claim, Plaintiff must allege facts plausibly showing two components: one objective, one subjective." *Caraway v. CoreCivic of Tennessee, LLC*, 98 F.4th 679, 683 (6th Cir. 2024).  The objective component requires Plaintiff to plausibly show that he faced an objectively excessive risk of harm.  *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Indeed, "the risk must be so grave that 'society' refuses to tolerate it."  *Id.* (citing *Helling v. McKinney*, 509 U.S. 25, 36 (1993)).  The subjective component requires Plaintiff to demonstrate facts permitting the reasonable inference that Defendants (1) had notice that Plaintiff was particularly vulnerable to assault by another inmate and (2) failed to reasonably respond to that risk.  *Id.* at 686 (citing *Zakora v. Chrisman*, 44 F.4th 452, 472 (6th Cir. 2022), *cert. denied*, ––– U.S. –––, 143 S. Ct. 2608 (2023); *Farmer*, 511 U.S. at 844).

Finally, "a prisoner does not need to prove that he has been the victim of an actual attack to bring a personal safety claim, but he must at least establish that he reasonably fears such an attack." *Lumbus v. Weisbar,* No. 1:23-CV-196, 2024 WL 1756915, at *27 (S.D. Ohio Apr. 24,

2024) (citing *Thompson v. Cnty. of Medina*, 29 F.3d 238, 242–43 (6th Cir. 1994)).  "Put another way, a plaintiff has the minimal burden of 'showing a sufficient inferential connection' between the alleged violation and inmate violence to 'justify a reasonable fear for personal safety.'"  *Id.*

According to the Verified Amended Complaint, the crux of Plaintiff's failure to protect claim arises from his fear that members of a gang known as the "KF's," including apparently his cellmate, were threatening him and his family because "they knew about [his] case."  (ECF No. 29 at ¶¶ 16-19.)  Plaintiff asserts that his requests to "check in" were denied and that, on February 7, 2021, "the CO's on duty allowed 7 inmates into [his] cell to steal all of [his] whites and intimidate and extort him."  (*Id*. at ¶ 20.)

In large part, this claim as raised by Plaintiff rests on his belief that his status as a sex offender placed him at excessive risk of harm.  Plaintiff's premise, however, is incorrect.  "[T]hat [Plaintiff] was a sex offender, and thus at risk of being attacked by other inmates, in and of itself, does not give rise to a heightened duty to protect under the Eighth Amendment.  *Schoonover v. Rogers*, No. 1:18-CV-302, 2021 WL 4479354, at *7 (S.D. Ohio Sept. 30, 2021), *aff'd*, No. 21-3970, 2022 WL 12258998 (6th Cir. Oct. 21, 2022) (citing *Thomas v. Erdos*, No. 1:16-cv-793, 2018 WL 3716894, at *4 (S.D. Ohio Aug. 3, 2018) ("The fact that prison officials considered [a prisoner] ... generally vulnerable to harm because of the nature of his crime, is not sufficient in and of itself to give rise to a duty to protect under the Eighth Amendment.") (citing *Kennedy v. Wilson*, No. 10-CV-299-HRW, 2013 WL 5234435, at *9 (E.D. Ky. Sept. 17, 2013)); *King v. Banks*, No. 2:10-cv-852, 2012 WL 2891264, at *4 (S.D. Ohio July 13, 2012) ("[I]t is almost always the case that prison officials know that sex offenders, especially those whose crimes involve children, may be targets of assault for just that reason. But it is not the law that prison officials thereby become liable every time such an inmate is assaulted.")).  Thus, any

potential for risk did not arise from Plaintiff's status as a sex offender standing alone. Rather, such risk arose from other prisoners' knowledge of that status. *Schoonover,* 2021 WL 4479354, at \*9. Generously construed, the statements in Plaintiff's Verified Amended Complaint, allege a threat to Plaintiff's safety based on the KF's knowledge of his status as a sex offender. For this reason, the Court will assume that Plaintiff has alleged an objectively serious risk of harm.

Accordingly, contrary to Plaintiff's understanding, the issue here is not whether any Defendant knew that Plaintiff was a sex offender or even that sex offenders generally may be more at risk. Rather, the question is whether Defendants Johnson, Mullins, or Baldwin were aware that other prisoners knew of Plaintiff's sex-offender status and disregarded that risk. *Schoonover,* 2021 WL 4479354, at \*9. These Defendants each have submitted evidentiary materials stating, *inter alia*, that they had no reason to believe that Plaintiff was at risk of serious harm from any other inmate at Ross. (ECF No. 63-1, Baldwin Aff., Exhibit 1a ⁋ 5, PAGEID #: 514; Declaration of Jason Johnson, Exhibit 1g ⁋ 5, PAGE ID: 526; Declaration of Michael Mullins, Exhibit 1h ⁋5, PAGEID #: 528.) In response, Plaintiff has not identified any evidence demonstrating that any of these Defendants possessed such knowledge. Nor has he presented any facts that would allow any of these specific Defendants to infer such a risk.

Indeed, any assertions in the Verified Amended Complaint of any particular Defendant's knowledge are virtually absent. For example, after describing a threat from his cellmate which, from Plaintiff's perspective, caused him to "fear for [his] life," based on Plaintiff's interpretation of certain events, Plaintiff alleges only that unidentified "CO's on duty were well aware." (ECF No. 29 at ⁋ 19.) At most, Plaintiff alleges that he told Defendant Baldwin that "[t]hey are threatening my life, I have to get out of this block." At the same time, Plaintiff fails to allege

facts to allow for the inference that Defendant Baldwin knew the identity of "they" in Plaintiff's statement or the basis for any alleged threats to Plaintiff. (*Id.* at ₱ 20.)

These conclusory statements are not sufficient to allow Plaintiff's failure to protect claim to survive summary judgment. With respect to Defendant Baldwin in particular, Plaintiff has not provided any factual support to demonstrate that such a comment, in isolation, would provide Defendant Baldwin with the requisite knowledge to sustain a failure to protect claim arising from the "KF's" knowledge of Plaintiff's status. Plaintiff's submitted Declarations from fellow inmates Charles Lovingshimer IV (ECF No. 1-2) and Andrew Carswell (ECF No. 3) do not aid his case. Instead, these Declarations suffer from the same lack of specificity. As a result, they also fail to demonstrate any particular Defendant's knowledge that *Plaintiff* faced any risk of substantial harm. (ECF No. 3).[5]

Additionally, Plaintiff's detailed efforts to dissect Defendants' submitted evidence and interrogatory responses fail to raise any genuine issue of material fact on this point. For these reasons, even assuming Plaintiff has adequately demonstrated an objectively serious risk of harm, he fails to meet the subjective component as to Defendants Johnson, Mullins, or Baldwin. Accordingly, it is **RECOMMENDED** that summary judgment be granted in Defendants' favor on this Eighth Amendment claim.

### D. Excessive Force Claim Against Defendant Skyler L. Baldwin

A convicted inmate's right to be free from the use of excessive force by a prison official

---

[5] Plaintiff also cites to a Declaration from Gary Michael Hill. (ECF No. 68-1 at 7.) No such Declaration is attached to Plaintiff's original filing. To the extent Plaintiff may be relying on Mr. Hill's Declaration submitted in Case No. 2:23-cv-167, that Declaration suffers from the same deficiencies as Plaintiff's Verified Amended Complaint and the other inmates' Declarations.

also is governed by the Eighth Amendment. *Whitley v. Albers*, 475 U.S. 312, 327 (1986). The "core judicial inquiry" whenever a prison official stands accused of using excessive force is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)).

As with other Eighth Amendment claims, excessive force claims include both a subjective and an objective component. *Johnson v. Sootsman*, 79 F.4th 608, 615 (6th Cir. 2023). The subjective component focuses on the prison official's state of mind, while the objective component analyzes whether the pain inflicted on the prisoner was "sufficiently serious." *Cordell v. McKinney*, 759 F.3d 573, 580 (6th Cir. 2014) (quoting *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011)). In the "use-of-force context, the Supreme Court has applied a more demanding subjective test but a more relaxed objective test." *Sootsman*, 79 F.4th at 615-16.

The subjective component of such a claim recently was described in this way:

The subjective intent necessary to sustain an excessive force claim goes beyond "deliberate indifference," which can suffice for inadequate medical care or conditions of confinement claims. *Id.* at 616. Instead, force must have been exerted "maliciously and sadistically to inflict pain" to be actionable under the Eighth Amendment. *Id.* (citing *Hudson*, 503 U.S. at 5-7). Force believed necessary, even if that belief is unreasonable, will not violate the Eighth Amendment. *Id.* (citing *Whitley*, 475 U.S. at 324).

To determine intent, courts are to consider: "What was the extent of the prisoner's injury? What was the nature of the threat that justified the use of force? Was the amount of force proportional to the threat? And did the officer take any actions designed to reduce the required amount of force?" *Id.* at 618 (citing *Hudson*, 503 U.S. at 7, and *Whitley*, 475 U.S. at 321). These questions underscore that force used "in a good-faith effort to maintain or restore discipline" does not violate a prisoner's Eighth Amendment rights. *Roberson v. Torres*, 770 F.3d 398, 406 (6th Cir. 2014) (quoting *Jennings v. Mitchell*, 93 F. App'x 723, 725 (6th Cir. 2004) (defendant corrections officers applied force—spraying the prisoner with pepper spray—in a "good-faith effort to maintain or restore discipline, not to maliciously cause pain[,]" where the prisoner repeatedly disobeyed the officers' direct orders to "sit cross-legged on his bunk and face the wall")).

28

*Brown v. Mahlman*, No. 1:22-CV-239, 2024 WL 248580, at *6 (S.D. Ohio Jan. 23, 2024), *report and recommendation adopted,* No. 1:22-CV-239, 2024 WL 1340261 (S.D. Ohio Mar. 29, 2024).  Significantly, "a good faith use of force in pursuit of a valid penological objective will rarely, if ever, violate the Eighth Amendment." *Cormia v. Parris*, No. 3:23-CV-291-TAV-JEM, 2024 WL 1220284, at *10 (E.D. Tenn. Mar. 20, 2024) (citing *Whitley*, 475 U.S. at 319–20).

Here, Plaintiff admits that he was engaging in self-harming behavior by cutting his wrist. The evidence submitted by Defendants confirms that, in response to this admitted behavior, Defendant Baldwin's use of force did not violate the Eighth Amendment.  For example, in his Affidavit, Defendant Baldwin explains that when he observed Plaintiff cutting his wrist, he acted pursuant to ODRC Policy 63-UOF-01 and gave Plaintiff several directives to stop.  (Baldwin Aff., ECF No. 63-1, Exhibit 1a, at ¶ 3, PAGEID #: 515.)  Defendant Baldwin further states that he recognized that Plaintiff's wrist cutting quickly could escalate to a life-threatening injury and utilized the minimum force necessary to gain Plaintiff's compliance, which was one short burst (11 grams) of OC spray.  (*Id*.)  Defendant Baldwin completed a Use of Force Report and an Incident Report.  The Use of Force was reviewed by the Deputy Warden of Operations and found to be justified.  (*Id.*)  Captain Michael Farley, tasked with reviewing Defendant Baldwin's Use of Force incident, confirmed this justification.  (Farley Aff., ECF No. 63-1 Exhibit 1d, at ¶ 9; PAGEID #: 520.)  To further support the defense that Defendant Baldwin's actions did not constitute an excessive use of force, Defendants also submitted a video recording of the exchange.  (ECF No. 63, Video, Exhibit 5, filed manually.)   The Court has reviewed the recording, and, although it is somewhat limited in its focus, the recording is consistent with

Defendants' version of events.  And, as discussed above, Plaintiff's medical records do not indicate treatment consistent with an excessive use of force.

In the face of all of this, Plaintiff offers no evidence demonstrating that Defendant Baldwin's use of force was undertaken for any purpose other than the pursuit of a valid penological objective.  Indeed, Plaintiff's admission of self-harming behavior confirms that Defendant Baldwin's actions had a valid penological basis.  Plaintiff's response to Defendants' evidence is to painstakingly parse both the video evidence of the incident and Defendant Baldwin's statements, accusing Defendant Baldwin of contradiction, fabrication, and perjury. These efforts, however, are insufficient to raise a genuine issue of material fact.  Accordingly, it is **RECOMMENDED** that summary judgment be granted in Defendant Baldwin's favor on Plaintiff's Eighth Amendment excessive force claim.

### E.  Qualified Immunity

Finally, Defendants also argue that they are entitled to qualified immunity. Qualified immunity protects government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Court need not address whether any of the Defendants are entitled to qualified immunity because the record shows there is no genuine dispute of material fact as to whether these Defendants violated plaintiff's Eighth Amendment rights.   Accordingly, as a matter of law, the Defendants are entitled to summary judgment.

## V. RECOMMENDATION

For the reasons stated above, it is **RECOMMENDED** that the Court **GRANT** Defendants' Motion for Summary Judgment in its entirety. (ECF No. 63.) Further, the Court **STRIKES** the Medical Exam Report found at PAGEID #: 548.

## PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a forfeiture of the right to *de novo* review of by the District Judge and forfeiture of the right to appeal the judgment of the District Court. Even when timely objections are filed, appellate review of issues not raised in those objections is forfeited. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal...." (citation omitted)).

**IT IS SO ORDERED.**


Date:  July 2, 2024                         */s/ Elizabeth A. Preston Deavers*
                                            **ELIZABETH A. PRESTON DEAVERS**
                                            **UNITED STATES MAGISTRATE JUDGE**